UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| NGM INSURANCE COMPANY,<br><br>　　*Plaintiff*,<br><br>v.<br><br>BEXAR COUNTY, TEXAS,<br><br>　　*Defendant*, | §<br>§<br>§<br>§<br>§   Civil Action No.  SA-15-CV-411-XR<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**ORDER**

On this date, the Court considered Plaintiff NGM Insurance Company's Motion for Summary Judgment (Docket no. 28), Defendant Bexar County's Cross Motion for Summary Judgment (Docket no. 35), and the corresponding responses, replies, and supplements. After careful consideration, the Court will DENY Plaintiff NGM's Motion and GRANT Defendant's Bexar County's Motion.

**BACKGROUND**

**I.    The Underlying Contract and Bond**

In December 2011, Defendant Bexar County entered into an agreement with American Cadastre, LLC ("AmCad"), a software developer. Docket no. 28-2 at 59–64. AmCad was to provide Bexar County with an Integrated Justice System by the end of the contract's five-year term. *Id.*; Docket no. 31-5 at 14. The total price for the project was $18,962,100. Docket no. 31-6 at 6. Payments were to be made on a set schedule that progressed concurrently with the work done on a yearly basis. Docket nos. 32-1 at 18–43, 32-2 at 1–6.

1

In association with the yearly payments that Bexar County was to make, the contract required AmCad to deliver a performance bond in favor of Bexar County. Docket no. 31-6 at 6–7. The contract stated as follows:

XIX. PERFORMANCE BOND

19.01 AMCAD shall deliver to County a performance bond in favor of County as beneficiary. AMCAD will pay the full cost of the performance bond. The performance bond shall be in an amount of one hundred percent (100%) of the annual total compensation to be paid under this agreement. In year one of this Agreement, the amount of the performance bond shall be for an annual compensation amount of FOUR MILLION, NINE HUNDRED AND EIGHTY-EIGHT THOUSAND, FIVE HUNDRED TWENTY-SEVEN DOLLARS ($4,988,527.00). For each year thereafter, the Parties will determine what the annual compensation would be for the next 12 months. AMCAD shall obtain an annual bond for the agreed amount to be in place on the anniversary date of the execution of this Agreement. The Performance Bond shall be in a form acceptable to County, and shall be issued by a surety authorized to transaction [sic] business in the state of Texas. The surety shall have an assigned rating from A.M. Best Company of A or higher. AMCAD shall be responsible for all premiums charged by Surety. The performance bond shall remain in full effect until County's Final System Acceptance as defined under Exhibit A, Section 15.2.

19.02 For purposes of Section 19.01, year one annual compensation includes the first twelve months Deliverables, seventy-five percent of the Software license costs, project management costs, and operational support. For year three, the annual compensation shall include twenty-five percent of the Software license costs, Deliverables for the twelve month period, project management costs, and operational support. For year two, four and five the annual compensation shall include Deliverables for each of the twelve month period, project management costs, and operational support.

*Id*. at 6–7. In relevant part, these provisions require that AmCad purchase performance bonds on a yearly basis. *Id*. at 6. Over the course of the five year agreement, the total amount of the bonds was to cover the full amount of compensation due under the contract; on a yearly basis, the amount of the bond was to cover the compensation due to AmCad for that year. *Id*. In the original agreement, the parties agreed that the compensation due in the first year was $4,988,527. *Id*. Thereafter, the parties were to agree annually on that year's compensation as it related to the

bond, and AmCad would obtain a bond in that amount. *Id*. For years two, four, and five, the bond covered deliverables due under the contract for that year, project management costs, and operational support. *Id*. at 7. For years one and three, the bond covered software licensing fees in addition to these costs. *Id*.

It is undisputed that the first two years of the contract were uneventful, with both parties performing their obligations under the contract. AmCad obtained the bond for year one from Hanover Insurance Company in the required amount. Docket no. 32-4 at 32–33. AmCad obtained the bond for year two from NGM in the amount that Bexar County deemed to be the compensation payable to AmCad for that year—$4,016,730. *Id*. at 34–35.

Before this second bond was set to expire, NGM issued a continuation certificate, carrying the bond through year three of the agreement. *Id*. at 36. The new amount of the bond for the third year under the continuation certificate was $3,800,000. *Id*. The continued bond was effective in the contract's third year, from December 6, 2013 through December 6, 2014. *Id*.

It is undisputed that AmCad stopped performing in June 2014. AmCad emailed Bexar County, saying that it was exiting the software solutions business. Docket no. 34-3. Bexar County sent AmCad and NGM a notice of breach and demand for cure, but in September 2014, AmCad filed for Chapter 11 bankruptcy and completely ceased further performance. Docket nos. 34-5, 43-6.

The bond language describing NGM's obligations in the event of AmCad's default provides:

> WHEREAS, [AmCad] has entered into a certain written contract with [Bexar County] effective the 6th day of December, 2011 for an Integrated and Operational Bexar County Integrated Justice System ("UBCIJS") which contract is hereby referred to and made a part hereof as fully and to the same extent as if copies at length were attached herein . . .

3

> [NGM], at the sole election and discretion of [NGM], may take any of the following actions [in the event of a breach]:
>
> (1) With notice to [Bexar County], provide financial assistance to [AmCad] to remedy any contractual default by [AmCad]; or
>
> (2) Undertake completion of the above contract by [AmCad] through its agents or through independent contractor; or
>
> (3) Determine the amount for which [NGM] may be liable to [Bexar County], and as soon as practicable thereafter, tender payment thereof to [Bexar County]; or
>
> (4) Pay the full amount of the penal sum [Bexar County] in complete discharge and exoneration of this Performance Bond, and all liabilities of [NGM] relating thereto.
>
> In the event of conflict or inconsistency between provisions of this Performance Bond and the provisions of the above contract, the provision of this Performance Bond shall control, or the obligation of [NGM] be deemed null and void to the extent of any enlargement or augmentation to the liabilities of [NGM] prescribed by this Performance Bond.

Docket no. 32-4 at 35.

## II. The Current Lawsuit and the Parties' Motions

Following AmCad's default, NGM filed the instant lawsuit. NGM seeks a declaration that its performance obligation under the bond is limited to deliverables due in year three of the contract and unfulfilled deliverables past due from year two. Docket no. 1 at 7. Bexar County opposes this construction of the bond, arguing that the bond is not limited to any subset of deliverables or time period. Docket no. 35 at 1. Bexar County also filed a counterclaim for breach of contract. Docket no. 6 at 4. NGM moved for summary judgment on its declaratory judgment action. Docket no. 28. Bexar County responded, Docket no. 34, and filed its own cross motion for summary judgment on the declaratory judgment issue, Docket no. 35.[1] With these

[1] The Court will consider the substance of Bexar County's response and its cross motion for summary judgment jointly. *See* Docket no. 35 at 1 ("[Bexar County] represents to the Court that the substance of this Motion largely mirrors that of its Response to Plaintiff NGM Insurance Company's Motion for Summary Judgment (Plaintiff's

motions, the parties are asking the Court to issue a declaration construing the language of the bond in order to determine what it covers, which in turn will determine the scope of NGM's liability under it. The parties have not moved for summary judgment on Bexar County's counterclaim for breach of contract.

### A. NGM's Position

NGM's argues that the bond only requires it to complete AmCad's obligations *for the bond year* at issue here. Docket no. 28 at 13 ("[T]he scope of the work covered by the Bond issued for year-three is the work to have been performed by AmCad in year-three."); *see also* Docket no. 48 at 5 ("[T]he performance guarantee [of the bond] guarantees performance *during the effective period of the bond*." (emphasis added)).

To support this stance, NGM makes several arguments. First, NGM argues that Article XIX of the agreement between Bexar County and AmCad, which requires AmCad to purchase bonds on a yearly basis, defines the scope covered by these bonds. Docket no. 28 at 13. This reading would limit the bonds' coverage to the years for which they were purchased. *Id*. NGM next argues that its options in the event of AmCad's default show that its guarantee of AmCad's performance is limited. Docket no. 28 at 12. Because NGM has four options from which it can choose, *see* Docket no. 32-4 at 35, and only one of these options requires full performance of the contract, NGM argues that the option to tender full performance cannot be invoked by Bexar County outside of NGM's discretion. Docket no. 28 at 12. Further, NGM points to the effective dates of the bond, arguing that these dates show that the bond implicitly covers only work to be performed in this period. *Id*. at 13. NGM says that it "did NOT contract to be responsible for work to have been performed before its bond went into effect or AFTER the bond expired." *Id*.

---

Motion). Dkt. No. 34. [Bexar County] is filing this separate Motion in order to comply with the Court's stated preference for receiving responses and motions in separate documents.").

at 16 (emphasis original). Finally, NGM cites two cases involving payment bonds where the bonds were limited to guaranteeing the performance of specific deliverables or work within a specific time period rather than an agreement at large. *Id.* at 14–15 (citing *U.S. for Use of Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 868 F. Supp. 10 (D.D.C. 1994) and *U.S. Gov't ex rel. Russel Sigler, Inc. v. Associated Mech., Inc.*, No. 2:09-CV-01238-RLH, 2010 WL 5100913, at *1 (D. Nev. Dec. 8, 2010)).

### B. Bexar County's Position

Bexar County argues that the bond guarantees performance of the full contract, not a certain subset of deliverables or a certain limited timeframe. Docket no. 35 at 1. Under this construction of the bond, NGM's liability is limited only by the penal sum of the bond—$3,800,000. *Id.*

Bexar County points out generally that all performance bonds are meant to secure full completion of an agreement, and this bond is no different. *Id.* at 7. To support this interpretation, Bexar County notes that the continuation certificate to the bond references the full "Integrated and Operational Bexar County Integrated Justice System" for which Bexar County contracted and "not some limited subset of deliverables due." *Id.* Further, the County asserts that NGM's option to remedy an AmCad breach by full performance, even if discretionary, indicates that the bond guarantees full performance. *Id.* Bexar County describes the absurdity of a contrary result—Bexar County's risk in the event of an AmCad default would increase dramatically over time because it would be receiving AmCad deliverables that are unusable without a finished product, but its protection from the bond would decrease concurrently. *Id.* at 8–9. Next, the County argues that the effective dates of the bond define the dates during which NGM is bound, but do not define the scope of NGM's obligations during that period. *Id.* at 9–10. Here, Bexar

County distinguishes the cases cited by NGM, saying that they deal with payment bonds rather than performance bonds. *Id*. at 10–11. Finally, the County argues that Article XIX of its contract with AmCad does not define the scope of the bond because the contract defines how to calculate the value of the bond rather than the scope of it. *Id*. at 11–12.

### III.    NGM's Prior Litigation

After the parties fully briefed their cross motions for summary judgment, Bexar County filed a motion to supplement. Docket no. 43. The Court granted this motion at a hearing on August 10, 2016 and also gave NGM a chance to respond to this supplement.

Bexar County's supplement to its cross motion for summary judgment raised the issue of judicial estoppel. Because judicial estoppel depends on the precise facts and dispositions of previous cases, a full discussion of the relevant cases is necessary.

#### A. The Indemnity Proceeding

In August 2014, NGM sued AmCad and its corporate indemnitors in the United States District Court for the Eastern District of Virginia in relation to two bonds covering AmCad projects—one for a project in Rockwall County, Texas and the other for the Bexar County project at issue in the present case. *Id*. at 1, 4. NGM alleged that AmCad's corporate indemnitors did not provide collateral for AmCad's default and therefore breached an indemnity agreement issued in NGM's favor on the bonds. *Id*. at 3–4. NGM alleged that it was exposed to liability "in excess of $4,810,880.00" due to AmCad's default—approximately $1,000,000 from the Rockwall bond and $3,800,000 million from the Bexar bond—and sought collateral in this amount. *Id*. at 3, 6. NGM's complaint says that the bonds "*guarantee AMCAD's performance* on the Bonded Projects." *Id*. at 4 (emphasis added). In further describing the Bexar Project, NGM's complaint says "NGM performance Bond No. 279933 names Bexar County, Texas as Obligee

and *guarantees AMCAD's performance of a contract with Bexar* for justice software and associate services." *Id*. at 4 (emphasis added). NGM added that "[a]s a result of NGM's issuance of Bonds to AMCAD, NGM has incurred and/or will incur substantial costs and damages arising from . . . *completing AMCAD's work* on the Bonded Projects." *Id*. at 9 (emphasis added). NGM does not mention any limitations on the size, scope, or applicability of the bond.

The defendants defaulted, and NGM moved for default judgment. *See* Docket no. 43-3 at 1–3. In support of its motion, NGM submitted the affidavit of corporate representative and claims attorney Eli Cinq-Mars, who stated that "[the Bexar County Bond] guarantees AMCAD's performance of a contract with Bexar for justice software solutions and associated services." Docket no. 43-2 at 3. Cinq-Mars added that "in order for NGM's rights under the Indemnity Agreements to be preserved and enforced, and specifically NGM's contractual right to be protected from loss, [AmCad's indemnitor] must post the sum of $3,800,000 with NGM as collateral security for the Bexar Bond Claim." *Id*. at 6. Again, neither NGM's motion for default judgment nor Cinq-Mars' affidavit mentions a limitation on the scope of the bond.

NGM's motion for default judgment was referred to Magistrate Judge Ivan D. Davis, who recommended the entry of default judgment against the defendants. Docket no. 43-3 at 1. Citing NGM's complaint, Judge Davis' report and recommendation made the following finding of fact: "The performance bonds—[the Rockwall Bond and the Bexar Bond]—*guaranteed the completion of the contract work* by [AmCad] for 'justice software and associated services.'" *Id*. at 5. Judge Davis recommended that NGM be granted specific performance of the indemnity agreement, obligating the indemnitors to post approximately $3,788,073.26 in collateral "to meet the claims against the Bexar County bond."[2] *Id*. at 11 (citing Cinq-Mars' affidavit).

---

[2] Judge Davis required the posting of approximately $3,800,000 in collateral, despite the combined $4,810,880 value of the Rockwall and Bexar Bonds, because NGM settled the claims on the Rockwall Bond. *Id*. at 10–11. Judge

The defendants did not file any objections to Magistrate Judge Davis' report and recommendation, but the parties settled before the district court took any action. Docket nos. 43-4, 43-5.

### B. The Bankruptcy Proceeding

In September 2014, AmCad filed for Chapter 11 bankruptcy. That December, NGM filed an adversary complaint related to the bankruptcy to enforce the indemnity agreement and establish that it was entitled to certain funds paid and payable to AmCad in connection with AmCad's projects in Texas. Docket no. 43-6. NGM's complaint said that "NGM issued bonds to [AmCad] *to guarantee AMCAD's performance of software development contracts* for Bexar County, Texas, and Rockwall County, Texas for justice software and associated services." *Id*. at 2 (emphasis added). NGM alleged that it "faces current exposure of *no less than $4,073,248.00* due to AMCAD's alleged failure to complete the contracts." [3] *Id*. at 2. In its answer to the bankruptcy complaint, AmCad said that the Bexar bond "guarantee[d] [its] performance on a contract with Bexar County, Texas." Docket no. 43-7 at 5.

This adversary proceeding settled, and the United States Bankruptcy Court for the District of Delaware, in response to a motion filed under Fed. R. Bankr. P. 9019, approved the settlement agreement. Docket no. 43-8.

### C. The Parties Contentions

Bexar County argues that NGM, in both the indemnity and bankruptcy proceedings, took a stance contrary to the one it has currently taken before this Court. Docket no. 43 at 6.

---

Davis recommended an award of damages to cover these settled claims. *Id*. Moreover, the amount of collateral to be posted was slightly less than the full $3,800,000 value of the Bexar Bond because one of AmCad's corporate indemnitors already paid $11,926.74 to NGM to offset the collateral amount demanded. *Id*. at 11.

[3] In arriving at this amount, NGM counted its exposure under the Bexar Bond as $3,800,000. *Id*. at 6. By the time it filed this adversary petition, NGM settled the Rockwall Bond claims for $273,248. *Id*. The sum of these two amounts is what NGM claimed as the floor for its liability due to AmCad's breaches—$4,073,248. *Id*. at 5.

9

According to the County, NGM previously took the position that the bond guarantees full, unqualified performance of AmCad's obligations but now seeks a declaration that the bond guarantees incomplete, limited performance of these obligations. *Id*. On this basis, Bexar County argues that the doctrine of judicial estoppel should apply and prevent NGM from taking a position inconsistent with one that it previously took. *Id*. at 7.

NGM responds that judicial estoppel does not apply for two reasons. Docket no. 48. First, it argues that its positions are not inconsistent. *Id*. at 5. According to NGM, the previous position "that the performance bond guarantees performance of a contract . . . is a general description of the bond" while the current position "that the performance guarantee applies to work to be performed during the effective period of the bond . . . is merely a definition of the performance guarantee." *Id*. Second, NGM argues that judicial estoppel cannot apply because the previous position was never accepted by a court due to settlements in both prior cases. *Id*. at 5.

## DISCUSSION

### I. Standard of Review

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary

judgment is inappropriate. *See Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## II.     Application of Judicial Estoppel

The Court finds that judicial estoppel applies and prevents NGM from taking the position that it has taken in its motion for summary judgment. Because judicial estoppel applies, there is no genuine issue of material fact on the construction and coverage of the bond, making summary judgment proper for Bexar County. Judicial estoppel is "a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position. The purpose of the doctrine is to protect the integrity of the judicial process, by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (internal citations and quotations omitted). In order for judicial estoppel to apply and prevent a party from asserting contrary positions in litigation, two requirements must be satisfied: (1) the position of the party to be estopped must be clearly inconsistent with its previous one; and (2) that party must have

convinced the court to accept that previous position. *Id*. at 206; *Blankenship v. Buenger*, No. 15-50974, 2016 WL 3538829, at *4 (5th Cir. June 28, 2016). Some cases have also required that the party to be estopped cannot have acted inadvertently, but this requirement has been inconsistently addressed in the Fifth Circuit and is not at issue here.[4] Despite these requirements, though, "judicial estoppel is not governed by 'inflexible prerequisites or an exhaustive formula for determining [its] applicability,' and numerous considerations 'may inform the doctrine's application in specific factual contexts.'" *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). Further, a district court's findings on judicial estoppel are reviewed on an abuse of discretion standard. *Love*, 677 F.3d at 262.

I.   **Clear Inconsistency of Positions**

The first element of judicial estoppel is that "the position of the party to be estopped must be clearly inconsistent with its previous one." *Coastal Plains*, 179 F.3d at 205. Inconsistency of positions often turns on whether the positions relate to the same issue or thing. Where two positions take opposite sides on the same issue, many cases find an inconsistency of positions. *E.g., RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 860 (5th Cir. 2010) (finding positions inconsistent where a company argued that potentially overlapping insurance policies covered different liabilities in one case but that those same policies covered the same liabilities in another); *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014), *cert. denied sub nom. Am. Commercial Lines, LLC v. United States*, 135 S. Ct. 956 (2015) (finding positions

---

[4] *See Gabarick v. Laurin Mar. (Am.) Inc* ., 753 F.3d 550, 553 (5th Cir. 2014), *cert. denied sub nom. Am. Commercial Lines, LLC v. United States*, 135 S. Ct. 956 (2015) (indicating that the Fifth Circuit only applies this requirement where judicial estoppel is based on non-disclosure of a claim in a prior bankruptcy proceeding). In any event, the parties' briefing acknowledges only the first two elements. Docket no. 43 at 6; Docket no. 45 at 4; *see also In re Oparaji*, 698 F.3d 231, 237 n.1 (5th Cir. 2012) ("By choosing not to address the issue in its briefing to this Court, [the party to be estopped] has waived the issue of inadvertence. As a result, only the first two factors will be addressed.").

inconsistent where a vessel owner argued that its charters were valid in an admiralty limitations proceeding but that those same charters were void in a later declaratory judgment action); *Nabors Completion & Prod. Servs. Co. v. Chesapeake Operating, Inc.*, No. 15-20170, 2016 WL 2772279, at *4 (5th Cir. May 12, 2016) (finding positions inconsistent where a party argued that Oklahoma law governed the dispute after previously arguing that Texas law governed).

On the other hand, inconsistency between positions generally does not exist where two positions relate to different things or where the inconsistency is merely implied. *In re Oparaji*, 698 F.3d 231, 237 (5th Cir. 2012) ("[T]his circuit[] [has] expressed reluctance to apply judicial estoppel in situations where a party's alleged change of position is 'merely implied rather than clear and express.'").[5] Arguing that the present case fits this pattern, NGM cites *GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 743 (N.D. Tex. 2014). There, the contractor of multi-faceted technological system previously argued that its system was not within the meaning of "computer software" for copyright preemption purposes. *Id*. at 742. The contractor then argued in subsequent litigation that different components of its system were "computer software" under other federal regulations. *Id*. Refusing to apply judicial estoppel against the contractor, the Northern District of Texas reasoned that the contractor's two positions merely emphasized two different components of the larger system, one of which was software and one of which was not, without taking inconsistent legal positions on the same issue. *Id*. at 743. The court viewed any potential inconsistencies as merely implied, and noted that "despite the semantic inconsistency, it

---

[5] Courts often cite the rule that "merely implied" inconsistencies do not justify judicial estoppel. Yet courts have also relied on implication to find that positions *are* inconsistent. See *Allen v. C & H Distributors, L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015) ("Because [the debtors] had an affirmative duty to disclose their personal-injury claim to the bankruptcy court and did not do so, *they impliedly represented* that they had no such claim. Thus, *such blatant inconsistency* readily satisfies the first prong of the judicial estoppel inquiry." (citations and quotations omitted) (emphasis added)); *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 860 (5th Cir. 2010).

13

is legally possible for [the contractor] to adopt these two positions regarding the role of software in this case and still prevail on both grounds." *Id*. (internal quotations omitted). [6]

The relevant position that NGM has taken in both the indemnity and bankruptcy cases is that the bond guarantees the completion of the contract, without further qualification. As a result, NGM has represented in its prior litigation that it stands to be liable for the full bond amount—$3,800,000. The position that it takes in this case is that the bond is limited to a certain subset of deliverables due under the contract. Accordingly, NGM now takes the position that it should be liable for less than the full $3,800,000. NGM argues that these positions are not "clearly inconsistent" because its current position is a "merely a definition of the performance guarantee" set forth in its previous position.

The Court disagrees, and finds these positions to be clearly inconsistent. The consequence of NGM's previous position, and a position in itself, was that AmCad's breach exposed NGM to liability for the full $3,800,000 amount of the bond, and that NGM should be indemnified for or entitled to this amount. This request for the full $3,800,000 is only possible if NGM's prior position—the bond guarantees performance—does not need further definition. If NGM's position was that the bond guarantees qualified or limited performance, NGM could not have requested indemnity for the unlimited, full bond amount, as it did in both prior cases.

NGM analogizes this case to *GlobeRanger*, where the contractor's positions on different parts of the same system were not inconsistent. Unlike *GlobeRanger*, however, NGM's two positions each relate to the same bond and whether it guarantees performance or limited performance. NGM's previous and current positions do not involve two different bonds or

---

[6] For examples of similar cases, *see, e.g., Trinity Marine Prod., Inc. v. United States*, 812 F.3d 481, 491 (5th Cir. 2016) (finding no inconsistency of positions because "asserting that one plaintiff's case is weak in one proceeding is not inconsistent with arguing that a second plaintiff's case is untimely."); *Phillips v. City of Dallas*, 781 F.3d 772, 783 (5th Cir. 2015) (finding no inconsistency of positions where "[the prior case] involved the application of a predecessor provision of *a different part* of the City's Code of Ethics." (emphasis added)).

guarantees of two different things; they involve the scope of a single guarantee created by a single bond. For this reason, *GlobeRanger* is distinct, and NGM's positions fit the pattern of those cases where inconsistent positions dealt with the same issue.

NGM also argues that the precise scope of the performance bond was not in issue in the indemnity and bankruptcy proceedings. As a preliminary matter, the contested nature of a position or issue is not an element of judicial estoppel. Further, to the extent that this could be a factor informing the Court's use of discretion and equitable application of the doctrine, the Court has found no cases where courts rely on similar facts, and NGM cites none. Finally, though the scope of the bond may not have been the *central* issue in the previous cases, NGM's prior claims for indemnity for the full amount of the bond put the scope of the bond's coverage into issue. For these reasons, the Court finds that NGM's positions in the indemnity and bankruptcy proceedings are clearly inconsistent with the position that it has taken here.

## II.   Convincing the Court to Accept a Previous Position

The second element of judicial estoppel requires that the "party must have convinced the court to accept that previous position." *Coastal Plains*, 179 F.3d at 206. This requirement of judicial acceptance "minimizes the danger of a party contradicting a court's determination based on the party's prior position, and, thus mitigates the corresponding threat to judicial integrity." *Id*. The Fifth Circuit's standard on this element is slightly unsettled. In *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 399 (5th Cir. 2003), the Court said that the judicial acceptance requirement could be met if a party makes an argument "with the explicit intent to induce the district court's reliance . . . regardless of whether that party prevail[s]." Since then, the Fifth Circuit has expressed reluctance towards this standard, indicating that it may be at odds with Supreme Court precedent. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 348 (5th Cir. 2008)

("While we need not rule on the validity of [*Hall*] here, we note its potential inconsistency with our general approach and with the Supreme Court's analysis in *New Hampshire*, 532 U.S. at 750–51."); *see also Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 644 n.43 (S.D. Tex. 2009) ("The Fifth Circuit has essentially disavowed the *Hall* dicta."). Instead of the *Hall* approach, the Fifth Circuit generally requires *actual* acceptance by a court, which can be either preliminary or final acceptance. *In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004).

With regard to settlements, those that occur "in *ordinary civil cases* do not require the judicial acceptance of either party's position, and judicial estoppel is therefore not warranted in a later proceeding." *Prideaux v. Tyson Foods, Inc.*, 387 F. App'x 474, 478 (5th Cir. 2010) (emphasis added). In *Prideaux*, the Fifth Circuit held that the district court did not abuse its discretion by refusing to judicially estop a party from taking a conflicting position in subsequent litigation because the previous case resulted in settlement. *Id*. There, though, the Court specifically noted the early stage at which the prior litigation settled:

> [T]he only events that transpired before the settlement were the filing of the initial pleadings by the parties. The parties filed no pre-trial motions and the court did not conduct a hearing or otherwise accept sworn testimony. As such, [the party taking conflicting positions] was not successful on any prior position and there was no "judicial acceptance."

*Id*.

NGM argues that there was never any judicial acceptance of its positions because both the indemnity and bankruptcy cases settled. The facts behind this argument are true and undisputed—the indemnity proceeding settled after the magistrate judge issued his report and recommendation, which indicated acceptance of NGM's position, and the bankruptcy proceeding settled with the bankruptcy court's approval. The issue, then, is whether settlements in these precise factual circumstances can constitute judicial acceptance of a position.

### A. The Indemnity Proceeding

The Court is satisfied that Judge Davis' report and recommendation constitutes judicial acceptance of NGM's previous position. At first glance, acceptance by a magistrate judge is, on its face, judicial acceptance—a magistrate judge is a judge after all. Supporting this conclusion are the policies underlying judicial estoppel. The Fifth Circuit has long emphasized that the doctrine exists to protect the integrity of the judicial process; to this end, it prevents parties from "playing fast and loose with the courts to suit the exigencies of self interest." *Coastal Plains*, 179 F.3d at 205. Given the realities of the legal system, settlements often play a large role in the exigencies of self-interest. By recognizing a magistrate judge's findings of fact as judicial acceptance, the Court protects the integrity of the judicial process, including the magistrate judge's role therein, by preventing a party from leveraging a favorable settlement with the threat that a district judge will adopt what a magistrate judge has already recommended. This plain-language view of "judicial acceptance" will discourage parties from "playing fast and loose" with their factual and legal positions before a magistrate for fear of being judicially estopped from asserting contrary positions down the line.

Aside from the policies of judicial estoppel, a narrower view of judicial acceptance is not in line with the case law. The logic driving *Prideaux*'s background rule that judicial acceptance does not occur in "ordinary" civil settlements was premised on the early stage at which the case settled—the parties had simply filed their initial pleadings without filing any pre-trial motions, conducting any hearings, or giving any sworn testimony. Here, litigation advanced to the stage of the magistrate judge taking sworn testimony in the form of Cinq-Mar's affidavit and issuing a report and recommendation on a dispositive motion.

Based on these factors, the Court finds that NGM convinced Judge Davis, in his report and recommendation, to accept its position, which was clearly inconsistent with the position that it currently takes. For these reasons, NGM is judicially estopped from arguing that the guarantee provided by the bond is limited or qualified, and Bexar County is entitled to summary judgment.

### B.  The Bankruptcy Proceeding

The Court finds that the bankruptcy court accepted NGM's prior inconsistent position, justifying judicial estoppel based on this case as well. In that proceeding, the parties settled with approval from the bankruptcy court under Fed. R. Bankr. P. 9019 at some point after AmCad filed its answer, but the precise timing is not clear. Docket no. 43-8.

There is scant precedent in the Fifth Circuit addressing whether a settlement approved by bankruptcy courts is judicial acceptance. The Sixth Circuit, however, has distinguished bankruptcy settlements from the "ordinary civil" ones in *Prideaux* due to the many interests involved: "[W]hen a bankruptcy court—which must protect the interests of all creditors—approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position, that, in our view, is sufficient 'judicial acceptance' to estop the party from later advancing an inconsistent position." *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988).[7] In addition, at least one court in the Fifth Circuit has found that a settlement requiring court approval is judicial acceptance for estoppel purposes. *See Everett v. Nat'l Union Fire Ins. Co. of Pittsburg, P.A.*, 857 F. Supp. 2d 611, 616–17 n.4 (S.D. Miss. 2012) (finding judicial acceptance based on a settled workers compensation claim where the settlement required judicial approval).[8]

---

[7] The Sixth Circuit's view of the judicial acceptance requirement in *Reynolds* has been cited with approval by the Fifth Circuit. *See In re Coastal Plains*, 179 F.3d at 206 (5th Cir. 1999).

[8] In *Everett*, the Southern District of Mississippi applied the disfavored *Hall* standard for determining judicial acceptance. *Id*. Nevertheless, its logic is instructive for distinguishing court-approved settlements from the "ordinary civil" settlement in *Prideaux*. *See id*.

Here again, this bankruptcy proceeding was no "ordinary civil case." Settlements requiring judicial approval, as here, implicate interests of parties who are not present to the settlement, and so the court approval process protects those rights. If parties were permitted to take conflicting stances for settlement purposes, they could manipulate this process, "playing fast and loose with the courts to suit the exigencies of self interest." Extending judicial acceptance to settlements approved by the bankruptcy court would protect the courts and prevent this problem.

Accordingly, the Court finds that NGM's positions in the bankruptcy proceeding, along with that court's approval of the settlement agreement, warrant the application of judicial estoppel against NGM. Based on judicial estoppel resulting from this case and the indemnity proceeding, there is no issue of fact on how to construe the bond or whether it is limited. Bexar County is entitled to summary judgment and a declaration construing the bond in its favor.

## CONCLUSION

In accordance with the foregoing, Plaintiff NGM's Motion for Summary Judgment (Docket no. 28), seeking a declaration regarding the scope of the bond, is DENIED. Summary judgment is GRANTED to Defendant Bexar County on its declaratory judgment that the penal bond at issue in this case is not limited by deliverables due under the Agreement or by the time period covering those deliverables, but only by the penal sum of the bond (Docket no. 35). This case remains open pending Bexar County's counterclaim for breach of contract (Docket no. 6).

It is so ORDERED.

SIGNED this 30th day of September, 2016.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE